IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**ANA E. GONZALEZ,**                    Case 1:15 CV 1367

    Plaintiff,                        Judge James Gwin

    v.                                Magistrate Judge James R. Knepp, II

**COMMISSIONER OF SOCIAL SECURITY,**

    Defendant.                        REPORT AND RECOMMENDATION

## INTRODUCTION

Plaintiff Ana Gonzalez ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny disability insurance benefits ("DIB"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. § 405(g). This matter has been referred to the undersigned for a Report and Recommendation pursuant to Local Rule 72.2(b). (Non-document entry dated July 9, 2015). For the reasons stated below, the undersigned recommends affirming the Commissioner's decision in part and remanding in part.

## PROCEDURAL BACKGROUND

Plaintiff filed for DIB on March 13, 2012, alleging an onset date of June 30, 2006. (Tr. 61). Plaintiff applied for benefits due to lupus; extreme fatigue; joint pain: knees, hips, shoulders, wrists, hands; severe abdominal pain; mouth ulcers; skin rash; alopecia; pericarditis; heart palpitations; depression; and dry mouth and eyes. (Tr. 61). Her claims were denied initially and upon reconsideration. (Tr. 61-67, 69-81). Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (Tr. 100). Plaintiff, represented by counsel, and a vocational expert ("VE") testified at a hearing before the ALJ on March, 6, 2014, after which the ALJ found

Plaintiff not disabled. (Tr. 23-60). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1); 20 C.F.R. §§ 404.955, 404.981.  Plaintiff filed the instant action on July 9, 2015. (Doc. 1).

## FACTUAL BACKGROUND

*Personal Background and Testimony*

Plaintiff was born February 21, 1974, and was 40 years old at the hearing. (Tr. 27). She lived with her husband and two teenaged sons in a two-story townhouse. (Tr. 27-28, 38). Plaintiff had a high school diploma and maintained a driver's license. (Tr. 28, 249). She had prior work as a hair stylist, day care worker, office manager, and loan processor; some of which occurred after the disability onset date. (Tr. 29-31, 201-31, 274).

Plaintiff stated she was unable to work because of fatigue and joint pain, mainly in her hands and knees. (Tr. 33, 246, 258). She reported the pain was a ten on a ten-point pain scale during a flare-up which she testified occurred two to four times a month and lasted for three to four days at a time. (Tr. 33). She stated her medications – Naproxen, Vitamin D, and Proventil – helped her manage her symptoms. (Tr. 33). Plaintiff reported she was not participating in physical therapy, occasionally used a cane, and had braces for her hands. (Tr. 34). She estimated she could stand/walk/sit for about an hour, bend/stoop/squat with difficulty, and lift seven to ten pounds (although she alleged problems with grasping). (Tr. 36).

Plaintiff also testified to difficulty sleeping all the time and an inability to take care of personal hygiene or walk up the stairs when she was flaring but otherwise she was capable of her personal care. (Tr. 39, 248). She stated she did a little cooking, cared for her sons by making their meals and helping with homework, and shopped but she did not do any housework or laundry. (Tr. 40-41, 249). She also reported walking her dogs and feeding them in the morning

2

but she was helped by her husband. (Tr. 247,253). She stated she used to enjoy dancing and gardening but was now unable to participate because it was too painful. (Tr. 250). Plaintiff reported being able to leave the house for special family occasions, grocery shopping, and eating out once a week. (Tr. 250).

During flare-ups, her hands, hips, and knees--mostly her left knee, were painful and she testified she was eating a "plant based diet to help with the inflammation." (Tr. 41, 45, 47-48). Plaintiff reported an almost complete inability to function during flare-ups. (Tr. 46). She stated she only saw her treating physician once every four to six months because there was currently no treatment that helped her. (Tr. 49). Plaintiff also reported side effects of medications: on Plaquenil, she had dry eyes and mouth; on Benlysta, she had severe abdominal pain; and she reported hand tremors which worsened while on immunosuppressant medications. (Tr. 253-54, 267).

*Relevant Medical Evidence*

On June 15, 2009, Plaintiff saw Ismail Ahmed, M.D., as a follow-up for chest pain she had recently experienced and sought treatment for in the ER. (Tr. 296, 344, 350, 495). At two exams in the next few days, she had no chest pain; regular heart rate and rhythm; no murmur, rubs, gallops, or clicks; and clear lungs. (Tr. 291, 296). Dr. Ahmed ordered an echocardiogram, an exercise stress test, and continued her on Metroprolol. (Tr. 296). The echocardiogram revealed left ventricular ejection fraction of 61%, normal valve structures, no pericardial effusion, and was overall normal. (Tr. 294-95, 291). Her stress test was also normal and revealed "[s]atisfactory exercise tolerance without evidence of ischemia". (Tr. 293).

Approximately a month later, Plaintiff returned and reported her chest pain and palpitations were controlled on Metroprolol. (Tr. 284). Again, her physical examination was

3

normal. (Tr. 284-85). In January 2010, Plaintiff reported no chest pain or shortness of breath, but complained of palpitations; her physical exam remained unchanged and Dr. Ahmed continued her Metroprolol. (Tr. 282). In August 2010, Plaintiff continued to report palpitations and stated she had chosen to stop using Metroprolol. (Tr. 280). Dr. Ahmed noted no significant issues and his physical examination was normal. (Tr. 280).

In August 2010, Plaintiff saw Donna Sexton-Cicero, M.D., for a rheumatological evaluation. (Tr. 423-25). Dr. Sexton-Cicero reported Plaintiff had a positive ANA[1] at a titer of 1:320. (Tr. 423). Plaintiff complained of stiff joints, some swelling in her hands and knees, frequent cold sores, her fingers turning blue with cold exposure, low-grade fevers, thinning hair, photosensitivity, and a rash on her upper chest, neck, and face. (Tr. 424). On examination, Dr. Sexton-Cicero observed no rashses, no oral lesions, normal heart sounds, clear lungs, no synovitis, no cyanosis, and no edema. (Tr. 424). Dr. Sexton-Cicero suspected "probable lupus" and recommended starting Plaintiff on hydroxychloroquine. (Tr. 424). A follow-up appointment revealed no change in her physical examination and she reported an improvement of symptoms with hydroxychloroquine. (Tr. 479-80).

On September 21, 2010, Wassim El-Hitti, M.D., evaluated Plaintiff for a microscopic hematuria without proteinuria. (Tr. 394, 401-02). On examination, Dr. El-Hitti reported normal cardiovascular and pulmonary findings but did note diffuse abdominal discomfort. (Tr. 394). Two days later, Plaintiff reported fatigue, weight loss and gain, night sweats, orthopnea, lower

---

1. "An ANA test detects antinuclear antibodies (ANA) in your blood…In most cases, a positive ANA test indicates that your immune system has launched a misdirected attack on your own tissue – in other words, an autoimmune reaction. But some people have positive ANA tests even when they are healthy." An ANA test may be ordered to detect diseases such as lupus, rheumatoid arthritis, or scleroderma. THE MAYO CLINIC, Tests and Procedures: ANA test, http://www.mayoclinic.org/tests-procedures/ana-test/basics/definition/prc-20014566 (last visited June 10, 2016).

extremity swelling, shortness of breath, nausea, vomiting, diarrhea, dysuria, and rash; but her physical examination was normal. (Tr. 430). On November 9, 2010, Dr. James Kontak performed surgery to remove and biopsy a polyp in Plaintiff's bladder. (Tr. 330-31). At a follow-up in December 2010, Plaintiff's only reported symptom was dysuria with frequency and hesitation; she denied all others. (Tr. 429).

On February 14, 2011, she again reported fatigue, to the point she needed to nap during the day, and a severe, nagging cough. (Tr. 473). She also stated she had occasional facial hives and hair loss but denied joint pain and mouth sores. (Tr. 473). On physical examination, Dr. Sexton-Cicero observed no rash, no definite alopecia, no oral lesions, clear lungs, and no synovitis. (Tr. 473).  In May 2011, Plaintiff reported fatigue "off and on" and epigastric burning. (Tr. 462). She had also experienced occasional face rash, joint pain "off and on", and a decrease in mouth sores. (Tr. 462). On physical examination, there was no change from the prior visit. (Tr. 462). Dr. Sexton-Cicero concluded Plaintiff's lupus was overall improved on hydroxychloroquine and her fatigue could be due to anemia. (Tr. 463).

On June 7, 2011, at a follow-up with Dr. El-Hitti's office Plaintiff complained of fatigue, weight loss and gain, night sweats, orthopnea, lower extremity swelling, nausea, vomiting, dysuria, rash, and Raynaud's[2]; but denied joint aches, chest pain, sleep disturbances, shortness of breath, photophobia, numbness/tingling, palpitations, and dizziness. (Tr. 428). On examination of her body systems, all were found to be within normal limits. (Tr. 428).  A few days later, Plaintiff reported chest pain, lower extremity swelling, shortness of breath, nausea, vomiting,

---

2. Raynaud's Phenomenon is a disorder that affects blood vessels, mostly in the fingers and toes. It causes the blood vessels to narrow when you are cold or feeling stress. Raynaud's can either be primary or secondary to other health problems. NATIONAL INSTITUTE OF ARTHRITIS AND MUSCULOSKELETAL DISEASES, www.niams.nih.gov/health_info/raynauds_phenomenon/raynauds (last visited June 10, 2016).

5

inconsistent appetite, dysuria, numbness/tingling, palpitations, and dizziness; but she denied sleep disturbances, joint aches, rash, and Raynaud's. (Tr. 427). On examination, her pulmonary and cardiovascular systems, and extremities were all within normal limits. (Tr. 427).

On August 18, 2011, Plaintiff reported iron infusions given by Dr. El-Hitti had resulted in an allergic reaction; however, she was receiving B12 injections per his instructions. (Tr. 475). She reported developing a periodic tremor in her left hand (she is right-handed), occasional facial rash, occasional knee pain, and some dry mouth. (Tr. 475). Dr. Sexton-Cicero's physical examination revealed no rash, no definite alopecia, no oral lesions, normal cardiovascular sounds, clear lungs, no cyanosis, no edema, no synovitis, and no tremor. (Tr. 475). Her diagnosis of overall improved lupus and fatigue due to possible anemia, remained the same. (Tr. 476).

In November 2011, Plaintiff complained of fatigue and was tearful at her examination due to frustration. (Tr. 467). She reported increased knee pain but was still trying to exercise. (Tr. 467). Her physical examination revealed no rash, no oral lesions, normal cardiovascular sounds, clear lungs, non-tender abdomen, no cyanosis, no edema, no synovitis, and no tremor. (Tr. 467). Dr. Sexton-Cicero added Methotrexate to her medication regimen. (Tr. 468). A month later, Plaintiff reported she was not feeling any better and still had joint pain and fatigue; she also reported mouth ulcers. (Tr. 469). However, her physical examination was unchanged from her previous visit. (Tr. 469). Dr. Sexton-Cicero discontinued the Methotrexate and prescribed Benlysta. (Tr. 470). Plaintiff received two injections of Benlysta but complained of abdominal pain. (Tr. 472). Plaintiff was seen at the emergency room in March 2012 for abdominal pain associated with her Benlysta injections. (Tr. 438, 443). The pain improved with medication and she was discharged the same day. (Tr. 444, 452). A follow-up visit with Dr. Sexton-Cicero after her hospitalization again revealed no abnormal physical findings. (Tr. 477).

In April 2012, Plaintiff decided to discontinue Benlysta injections after three attempts due to the abdominal discomfort. (Tr. 551). She still reported join pain and stiffness, and some fatigue. (Tr. 551). On physical examination, Dr. Sexton-Cicero noted no changes to her physical findings except a tender epigastrium and mild warmth and swelling of the left knee. (Tr. 551). Dr. Sexton-Cicero affirmed Plaintiff's lupus was still active and re-prescribed Methotrexate. (Tr. 552). On August 1, 2012, Plaintiff reported frequently using an inhaler and frequent shortness of breath. (Tr. 614). Her complaints of fatigue, facial rash, joint pain, mouth sores, and dry mouth continued. (Tr. 614). Dr. Sexton-Cicero's physical examination revealed no abnormalities except she noted some hair on the back of Plaintiff's shirt. (Tr. 615). An August 2012, CT of Plaintiff's chest revealed no cardiopulmonary process (Tr. 521) and a pulmonary function test ("PFT") taken around the same time was also normal (Tr. 515). At a September 2012, follow-up, Dr. Sexton Cicero noted the normal spiral CT (with no pleural effusion or aneurysm), normal chest x-ray, and normal PFT. (Tr. 611, 616-17). At this time, Plaintiff reported she was following a vegan diet, "was not quite as fatigued", still had joint pain, was losing some hair, but denied any rashes. (Tr. 611). Her physical examination again revealed no abnormalities or signs of symptoms. (Tr. 612).

In September 2013, Plaintiff was complaining of a urinary tract infection, difficulty walking, chest pain, and palpitations. (Tr. 640). By this time, she was no longer taking hydroxychloroquine to manage her lupus but rather had been switched to Aleve and Naproxen, along with a Proventil inhaler. (Tr. 641). In November 2013, while performing a physical, Dr. Ewa Grosse-Sawicka recommended Plaintiff "follow healthy diet, [and] exercise at least 150 minutes per week"; she also noted fatigue and a Vitamin D deficiency. (Tr. 646).

7

*Opinion Evidence*

On July 25, 2013, Plaintiff had a vocational assessment of residual employability completed by Mark Anderson, M.S., CDMS, LPC. (Tr. 268). Mr. Anderson reviewed the medical records and opinions of Dr. Sexton-Cicero and Plaintiff's reported symptoms of joint pain (knees, wrists, and hands), fatigue, dyspnea, palpitations, shortness of breath, and pericarditis. (Tr. 269). He noted that at the time of his evaluation, Plaintiff "was in the midst of a flare up." (Tr. 269). Plaintiff reported to him that she had two to three flare-ups a month and that they generally lasted up to seven days. (Tr. 269). She reported increased symptoms with extremes in temperature and humidity, and periodic hand tremors. (Tr. 269).

Mr. Anderson concluded Plaintiff had minimal ability in motor coordination, finger dexterity, manual dexterity, and eye/hand/foot coordination. (Tr. 270). He assessed this ability based on "difficulty/unable to pick up the pins on the Pegboard testing without pain or tremors being experienced in both hands during the testing." (Tr. 270-71). Mr. Anderson then summarized Plaintiff's symptom complaints which he believed limited her ability to climb stairs, stand, walk, or sit for prolonged periods. (Tr. 271). He also concluded Plaintiff could not handle extreme temperatures or humidity and had problems with balance. (Tr. 271). He opined she "had no current return to work potential", and that during flare-ups, she was capable of performing only less than a full range of sedentary activities. (Tr. 272).

*Consultative Examination*

Plaintiff underwent a consultative psychological evaluation with Deborah Koricke, Ph.D., on May 8, 2012. (Tr. 484). Plaintiff reported no history of mental health treatment and stated she had become depressed in reaction to her deteriorating health. (Tr. 485). Dr. Koricke noted Plaintiff appeared depressed at the interview and although she answered all the questions, it was

sometimes difficult to engage her in conversation. (Tr. 486). Aside from appearing fatigued, depressed, and withdrawn, Plaintiff's mental status evaluation was normal. (Tr. 486-87). Dr. Koricke diagnosed Plaintiff with adjustment disorder with depressed mood and assigned her a Global Assessment of Functioning ("GAF") score of $65^3$. (Tr. 487).

Dr. Koricke opined Plaintiff had no difficulty in understanding questions or instructions, including complex or multi-step instructions nor did she have problems maintaining attention or concentration. (Tr. 488). She also opined Plaintiff would have no difficulty in getting along with coworkers or supervisors and could respond appropriately to work stress. (Tr. 488-89). Dr. Koricke did suggest that a flare-up in Plaintiff's physical symptoms could negatively affect her mental abilities, including her ability to get along with others and handle stress. (Tr. 488-89).

*State Agency Reviewers*

On June 18, 2012, Bradley Lewis, M.D., opined Plaintiff could occasionally lift/carry 50 pounds; frequently lift/carry 25 pounds; stand/walk/sit for six hours in a normal eight-hour workday; frequently climb ladders, ropes, scaffolds; and frequently stoop/crouch/crawl. (Tr. 65-66). These limitations were due to her joint pain. (Tr. 66).

On reconsideration, Lynne Torello, M.D., opined Plaintiff could occasionally lift/carry twenty pounds; frequently lift/carry ten pounds; stand/walk/sit for six hours in an eight-hour workday; occasionally climb ramps, stairs, ladders, ropes, or scaffolds; and occasionally stoop/kneel/crouch/crawl; again, these restrictions were based on her joint pain. (Tr. 75-77).

---

3. The GAF scale represents a "clinician's judgment" of an individual's symptom severity or level of functioning. American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders*, 32-33 (4th ed., Text Rev. 2000) (*DSM-IV-TR*). A GAF score between 61-70 indicates some mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships. *Id.* at 34.

Cindy Matyi, Ph.D., opined that Plaintiff had mild restrictions in her activities of daily living, and moderate difficulties in maintaining social functioning and maintaining concentration, persistence, and pace. (Tr. 74). She concluded that Plaintiff could comprehend, remember, and carry out simple (1-2 step) and occasional complex (3-4 step) instructions; had compromised sustainability but could maintain attention, make simple decisions, and adequately adhere to a schedule; could relate adequately on a superficial basis; and changes should be well-explained and introduced slowly. (Tr. 77-79). Dr. Matyi opined these restrictions were due to Plaintiff's depression and preoccupation with her physical well-being. (Tr. 77-79).

*ALJ Decision*

In March 2014, the ALJ concluded Plaintiff had the severe impairments of systemic lupus erythematosus ("SLE") and adjustment disorder with depressed mood; but these severe impairments did not meet or medically equal any listed impairment. (Tr. 11-13). The ALJ then found Plaintiff had the RFC to perform light work except no climbing ladders, ropes, or scaffolds; occasional climbing ramps or stairs; and occasional balancing, stooping, kneeling, crouching, and crawling. (Tr. 13). She also retained the ability to perform simple to multi-step tasks in a low stress environment (no fast pace, strict quotas, or frequent duty changes) with only superficial interpersonal interactions. (Tr. 13). Based on these restrictions the VE testified Plaintiff could perform the representative occupations of wire worker, electronics worker, assembly press operator, table worker, bench hand, or final assembler. (Tr. 16).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in

the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process – found at 20 C.F.R. § 404.1520 – to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

11

    5.    Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The Commissioner considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Plaintiff argues the ALJ erred because (1) he did not perform a proper credibility evaluation and thus, his determination was not supported by substantial evidence; (2) his analysis of Listing 14.02 was not supported by substantial evidence and Plaintiff presented evidence to conclude she met the listing; and (3) he improperly weighed the opinion of vocational expert, Mark Anderson. (Doc. 14). The Court will address each argument in turn.

*Credibility*

Plaintiff's first assignment of error centers on the ALJ's determination of partial credibility. (Doc. 14, at 16-21). The Plaintiff concedes that the ALJ addressed appropriate factors in making his credibility determination – activities of daily living, medical evidence, and course of treatment – but argues that he either mischaracterized the evidence or made inaccurate conclusions. (Doc. 14, at 18-21).

"Because of their subjective characteristics and the absence of any reliable techniques for measurement, symptoms are difficult to prove, disprove, or quantify." SSR 82-58, 1982 WL

31378, *1. Analysis of alleged disabling symptoms turns on credibility and an ALJ is not bound to accept as credible Plaintiff's testimony regarding symptoms. *See Hickey-Haynes v. Barnhart*, 116 F. App'x 718, 726-27 (6th Cir. 2004); *Cohen v. Sec'y of Dep't of Health & Human Servs.*, 964 F.2d 524, 529 (6th Cir. 1992). When a claimant's statements about symptoms are not substantiated by objective medical evidence, the ALJ must make a finding regarding the credibility of the statements based on a consideration of the entire record. SSR 96-7p, 1996 WL 374186, *1.

The regulations establish a two-step process for evaluating pain. *See* 20 C.F.R. § 404.1529; *see also* SSR 96-7p, 1996 WL 374186. For pain or other subjective complaints to be considered disabling, there must be: 1) objective medical evidence of an underlying medical condition; or 2) objectively, the medical condition is of such severity that it can reasonably be expected to produce such disabling pain. *Felisky v. Bowen*, 35 F.3d 1027, 1038 (6th Cir. 1994). This standard does not require "objective evidence of the pain itself." *Duncan v. Sec'y of Health & Human Servs*, 801 F.2d 847, 853 (6th Cir. 1986). In evaluating credibility of Plaintiff's complaints an ALJ considers certain factors:

> (i) [A claimant's] daily activities;
>
> (ii) The location, duration, frequency, and intensity of [a claimant's] pain or other symptoms;
>
> (iii) Precipitating and aggravating factors;
>
> (iv) The type, dosage, effectiveness, and side effects of any medication [Plaintiff] take[s] or ha[s] taken to alleviate your pain or other symptoms;
>
> (v) Treatment, other than medication, [a claimant] receive[s] or ha[s] received for relief of [Plaintiff's] pain or other symptoms;
>
> (vi) Any measures [Plaintiff] use or ha[s] used to relieve [a claimant's] pain or other symptoms; and

>  (vii) Other factors concerning [Plaintiff's] functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(3).

Ultimately, it is for the ALJ, not the reviewing court, to judge the credibility of a claimant's statements. *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (ALJ's credibility determination accorded "great weight"). "Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997). The Court is "limited to evaluating whether or not the ALJ's explanations for partially discrediting [claimant's testimony] are reasonable and supported by substantial evidence in the record." *Jones*, 336 F.3d at 476. The Court may not "try the case de novo, nor resolve conflicts in evidence . . . " *Gaffney v. Bowen*, 825 F.2d 98, 100 (6th Cir. 1987).

Here, the ALJ began his discussion of Plaintiff's credibility by summarizing her testimony regarding her symptoms: she alleged disability due to fatigue, joint pain, rash, dry mouth and eyes, and depression which were exacerbated during flare-ups that occurred up to three times a month and lasted for three to four days at a time. (Tr. 14). He then proceeded into a discussion of the medical evidence which he found inconsistent with this testimony. (Tr. 14). Particularly, he noted that Dr. Sexton-Cicero had always found normal physical findings, (Tr. 424, 462-80, 551, 612, 615), her diagnostic testing was normal, (Tr. 291, 293-95, 495, 515, 521), it was recommended that she exercise 150 minutes a week, (Tr. 646), and that she had never sought mental health treatment (Tr. 14, 37, 485). In fact, Dr. Sexton-Cicero never observed any of Plaintiff's alleged symptoms of lupus beyond noting once that Plaintiff had mild swelling in her left knee and once that Plaintiff had hair on her shirt (presumably tied to Plaintiff's reports of alopecia). (Tr. 551, 615). The ALJ concluded that if Plaintiff truly was flaring between six and

14

twelve days a month and receiving regular medical treatment (approximately every four to six weeks over a multi-year period); it was unlikely that her medical records would show no evidence of those flare-ups. (*See* Tr. 15, 280-85, 291, 296, 394, 424, 427-30, 462-80, 551, 612, 615). The ALJ was entitled to review inconsistent medical evidence in evaluating the veracity of Plaintiff's complaints. *See Walters*, 127 F.3d at 531.

The ALJ next addressed Plaintiff's report that she was "generally able to walk her dogs in the morning" which the ALJ found inconsistent with her alleged limitations. (Tr. 15). The Plaintiff argues the ALJ took this out of context because it did not account for her inability to do this during flare-ups and her need to rest after completing the walk. (Doc. 14, at 19). It is true that with episodic disorders the ALJ should consider the possibility of flare-ups. *See Wilcox v. Sullivan*, 917 F.2d 272, 277 (6th Cir. 1990). However, the ALJ's credibility determination is consistent with a finding that Plaintiff suffers from lupus; a condition which at certain times will allow Plaintiff to undertake a relatively normal life. Plaintiff confirmed that her pain and symptoms are not constant but are indeed, episodic. (Tr. 33, 39, 46). Thus, the ALJ's finding that Plaintiff, at times, is capable of more than she attested to is consistent with the medical evidence and the nature of the disease. The ALJ's conclusion included a reasonable citation to available evidence that goes to a proper credibility factor.

The ALJ next cited that Plaintiff complained of hand tremors but there were no medical records which substantiated this symptom. (Tr. 15). Plaintiff did testify to tremors and report having hand tremors to Dr. Sexton-Cicero on one occasion (Tr. 34, 475); however, Dr. Sexton-Cicero never observed tremors in her appointment notes (Tr. 467, 475). In her brief, Plaintiff argues the ALJ's statement that no "provider has verified any tremors or other neurological deficits" was a mischaracterization of the evidence because vocational expert, Mark Anderson,

15

did observe Plaintiff's tremor. (Tr. 15, 270-71; Doc. 14, at 19). Plaintiff also argues that Mr. Anderson's report undermines another of the ALJ's conclusions, i.e., that Plaintiff had never reported a flare-up in an exam note, because Plaintiff was in the midst of flare-up during her appointment with him. (Tr. 15, 271; Doc. 14, at 19). However, as will be discussed further below, Mr. Anderson is not a medical source and the ALJ correctly stated that no exam or provider could verify this symptom. (Tr. 15).

The last factor the ALJ discussed was Plaintiff's treatment attempts: he noted she never sought emergency treatment during a flare-up despite her allegation that she was completely unable to care for herself; and she had not sought out a rheumatologist or other specialist. (Tr. 15). First, the ALJ was incorrect to state that Plaintiff had not sought out a rheumatologist. A review of the record indicates that Dr. Sexton-Cicero is a rheumatologist and Plaintiff was referred to her for a rheumatology consult. (Tr. 423-24). Second, Plaintiff argues that lupus is not the type of disease that one usually seeks emergency treatment for during a flare-up but is rather managed through medication and doctor's appointments, which Plaintiff did. (Doc. 14, at 20-21). Although this may be true, the ALJ's finding that Plaintiff's alleged level of limitations during flare-ups (i.e., complete incapacity) is inconsistent with a failure to seek any medical treatment during flare-ups is still rational. *See Her v. Comm'r of Soc. Sec.,* 203 F.3d 388, 389-90 (6th Cir. 1999).

The Court is limited to determining whether the ALJ applied the appropriate standard to the credibility assessment. *Cruse*, 502 F.3d at 542. It is certainly true that Plaintiff's subjective complaints support her position and that these complaints could support difference conclusions; however, that does not alter the reasonableness of the ALJ's citations to inconsistent medical evidence and testimony that do not wholly support her credibility. *See Jones,* 336 F.3d at 477.

16

From a review of the opinion and the record, the ALJ reviewed the appropriate factors and had substantial evidence to support the conclusion that Plaintiff was not entirely credible.

***Listing 14.02***

Next, Plaintiff argues she satisfies the requirements of Listing 14.02(A). (Doc. 14, at 21-24). The listing of impairments is used to determine whether a claimant's impairments meet or medically equal a particular listing. If a claimant meets the requirements of a listed impairment, then the claimant is considered disabled. 20 C.F.R. § 404.1520(d). If not, the sequential evaluation process continues and the ALJ must determine whether a claimant's impairment or combination of impairments is the "medical equivalence" of a listed impairment. *Id.* An impairment is equivalent to a listed impairment "if it is at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. § 404.1526(a). In order to determine whether a claimant's impairments are medically equivalent to a listing, the ALJ may consider all evidence in a claimant's record. 20 C.F.R. § 404.1526(c).

Listing 14.02(A) requires SLE accompanied by the "[i]nvolvement of two or more organs/body systems, with: [o]ne of the organs/body systems involved to at least a moderate level of severity; and [a]t least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss)." 20 C.F.R. pt. 404, subpart P, app. 1, § 14.02. "Major organ or body system involvement can include: Respiratory (pleuritis, pneumonitis), cardiovascular (endocarditis, myocarditis, pericarditis, vasculitis), renal (glomerulonephritis), hematologic (anemia, leukopenia, thrombocytopenia), skin (photosensitivity), neurologic (seizures), mental (anxiety, fluctuating cognition ('lupus fog'), mood disorders, organic brain syndrome, psychosis), or immune system disorders (inflammatory arthritis)." *Id.* at § 14.00D1.

The ALJ found Plaintiff's lupus "does not involve any body system, as all findings show normal exams", the flare-ups were "undocumented", and there was "no objective evidence [of] a marked limitation to her activities". (Tr. 12). Plaintiff argued the record consistently showed chronic anemia, photosensitivity, and a mood disorder. (Doc. 14, at 23). In reviewing the record, anemia was consistently diagnosed and treatment was attempted. (*See* Tr. 427, 463, 475, 568, 570, 612, 615, 639, 651). Further, Dr. Sexton-Cicero consistently tied Plaintiff's anemia to her fatigue. (Tr. 462-80). As to the other two conditions, Plaintiff never presented with a rash at any of her medical appointments (though she reported them) and Plaintiff had not sought any mental health treatment. (*See* Tr. 37, 424, 462-80, 485, 551, 612, 615). However, the evidence clearly shows a hematologic condition; the ALJ erred by not finding that her anemia qualified.

Because the ALJ erred in his analysis of Listing 14.02(A), without expressing any opinion as to the final determination, the undersigned recommends remanding this portion of the decision for consideration of Plaintiff's anemia as potentially satisfying the first element and any constitutional symptoms relating thereto that may satisfy the second element.

*"Other Source" Opinion*

Plaintiff's final argument alleges the ALJ improperly discounted Mark Anderson's opinion as derivative without accounting for the fact that he performed his own independent testing. (Doc. 14, at 24-25). An ALJ has discretion to determine the proper weight to accord opinions from "other sources". *Walters*, 127 F.3d at 530. An "other source" can provide "insight into the severity of the impairment(s) and how it affects the individual's ability to function." SSR 06-03p, 2006 WL 2329939, at *3. Further, "opinions from non-medical sources who have seen the [plaintiff] in their professional capacity should be evaluated by using the applicable factors,

18

including how long the source has known the individual, how consistent the opinion is with other evidence, and how well the source explains the opinion." *Cruse*, 502 F.3d. at 541.

The ALJ gave little weight to Mr. Anderson's opinion because it was based on Dr. Sexton-Cicero's conclusions, to which the ALJ gave little weight. (Tr. 15). This proffered reason is a challenge to the opinion's supportability. The ALJ did not credit the existence of severe symptoms as reported by Dr. Sexton-Cicero and accepted by Mr. Anderson; thus, he found the opinion was entitled to little weight because the limitations opined were based on Plaintiff's subjective reports and not objective evidence. (Tr. 15). This is an acceptable reason to discount the weight of an "other source" opinion.

Nonetheless, the ALJ's stated reason for discounting Mr. Anderson's opinion is only partially true because Mr. Anderson did observe hand tremors. (Tr. 270-71). Mr. Anderson stated that he had reviewed Dr. Sexton-Cicero's opinions (Tr. 269) but he also attempted to perform testing on Plaintiff; however, she was unable to complete it due to hand tremors (Tr. 270-71). Mr. Anderson concluded that between her reported symptoms and his observations about her manipulative abilities, Plaintiff was unable to work. (Tr. 271). Thus, the Court must analyze whether "there is reason to believe that a different outcome could result had the 'other source' opinion[] been [otherwise] assessed." *Carroll v. Astrue*, 2010 WL 2643420, at *10 (N.D. Ohio) (citing *Kobetic v. Comm'r of Soc. Sec.*, 114 F. App'x, 171, 173 (6th Cir. 2004)).

Considering the other evidence in the record, the Court finds that any error of the ALJ in weighing Mr. Anderson's opinion was harmless. First, Mr. Anderson's observation of hand tremors is the only objective notation of the symptom – thus, a single verifiable instance of a symptom would hardly be enough to overcome the other record evidence. Second, the majority of Plaintiff's symptoms, upon which Mr. Anderson based his restrictions, were based on

subjective reports and the ALJ found Plaintiff to only be partially credible. Third, in weighing the other factors such as consistency and length of relationship, neither supports great weight to the opinion of Mr. Anderson. He only saw Plaintiff one time and an inability to work was not consistent with her reported level of activity when not on a flare-up. Fourth, the ALJ's decision to give considerable weight to the state agency reviewer's opinion was not contested by Plaintiff. Generally in the hierarchy of opinions, a medical opinion from a non-examining physician will outweigh that of a non-medical "other source". *See* 20 C.F.R. § 4040.1527. And here, bearing in mind all the other potential reasons not to give full weight to Mr. Anderson's opinion, the Court cannot find error in the ALJ's reliance on the state agency reviewer's opinion over that of an "other source" in forming the RFC. Therefore, the ALJ did not err in weighing Mr. Anderson's opinion.

## CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, the undersigned recommends affirming the Commissioner's decision, except as to the application of Listing 14.02(A), which should be remanded pursuant to sentence four for further proceedings consistent with this recommendation.

      s/James R. Knepp II
United States Magistrate Judge

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981).